UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

Barnard Stevens and Maria L. Stevens,

                Debtors.

Case No.: 12-32221
Chapter: 7

---

Joseph Pierce,

                Plaintiff,

v.

Barnard Stevens and Maria L. Stevens,

                Defendants.

Adv. Proc. No. : 13-50003

---

Appearances:

Anthony P. Adorante, Esq.    for Plaintiff
Adorante, Turner & Assoc.
5111 West Genesee Street
Camillus, New York 13031

Lauren H. Seiter, Esq.    for Defendants
Harris Beach PLLC
333 West Washington Street, Suite 1200
Syracuse, New York 13202

**Memorandum-Decision and Order**

Joseph Pierce ("Plaintiff") filed this adversary proceeding seeking a determination that a disputed debt of approximately $35,000 allegedly owed to him by Barnard Stevens and Maria Stevens ("Defendants" or "Debtors") is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).[1] Defendants answered the complaint denying the material allegations, responding that the complaint fails to state a cause of action upon which

---

[1] Unless otherwise stated, all sectional references are to Title 11 of the United States Code.

relief may be granted and seeking costs and reasonable attorney's fees. The court conducted a two-day trial on September 17 and September 19, 2014. After the Plaintiff rested, Defendants' counsel made a motion to dismiss the complaint for Plaintiff's failure to meet its burden of proof. The court reserved decision on the motion and proceeded with the trial. Based upon the entire record of this matter, the court now grants Defendants' motion to dismiss and finds the debt dischargeable. The request for an award of attorney's fees is denied, but costs may be taxed on motion.

### *Jurisdiction*

The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and §§ 157(b)(2)(I). This memorandum-decision and order incorporates the court's findings of fact and conclusions of law as permitted by Fed. R. Bankr. P. 7052.

### *Background Facts*

Defendant Barnard Stevens is a mason who has worked for Stevens Masonry for the past 12 years. Defendant Maria Stevens is Barnard's wife who was solely registered to do business as ("d/b/a") Stevens Masonry. At all times relevant to the complaint, Mr. Stevens did all of the hands-on masonry work while Ms. Stevens kept all the books and records and managed Stevens Masonry's two bank accounts. Plaintiff Joseph Pierce is a seasoned mason who has worked his entire adult-life in the field. For the past 15 years, Mr. Pierce has done business as JP Construction.

In January of 2005, Mr. Pierce and Mr. Stevens orally agreed to work collectively on a number of masonry jobs. They did not write anything down to confirm the nature of their agreement nor did they setup a legal entity or open a joint bank account. Mr. Pierce

2

never spoke with Ms. Stevens regarding the agreement. Her knowledge of the situation stems only from conversations with her husband. Subsequently, Mr. Pierce and Mr. Stevens worked collectively on a number of masonry jobs from January 2005 to March 2006. After a job was completed, the two agreed that the money would be deposited into Stevens Masonry, then, after taking out expenses and making payroll, they would split the profits. There came a time, however, when the two stopped splitting the profits and each took a weekly salary. Mr. Stevens received $1,000 a week and Mr. Pierce received $1,100 a week.[2] At trial, the court heard testimony from Terri Wirth, another mason who worked regularly with both Mr. Pierce and Mr. Stevens. According to Mr. Wirth, the two often referred to each other as partners and such "was common knowledge."

At the beginning of their arrangement to work together, Stevens Masonry only had a checking account in Ms. Stevens' name d/b/a Stevens Masonry. This was also the only checking account that the Stevenses had for personal use. In June 2005, Ms. Stevens opened up a savings account for Stevens Masonry, also in her name d/b/a Stevens Masonry. Ms. Stevens was the only one with authority to make deposits or withdrawals from either account. Ms. Stevens decided to open the savings account after conversations with her husband. She never discussed the savings account with Mr. Pierce and, in fact, Mr. Pierce did not know of the existence of the savings account until after bringing suit. According to her testimony, the purpose of opening the savings account was to start saving for an eventual formal partnership between Mr. Pierce and Mr. Stevens. Although the savings account was meant to provide a source of funds for a future partnership, testimony as well as the bank records demonstrate that funds were withdrawn from the account almost as quickly as they came in. According to the Debtors, this was because of

---

[2] Mr. Pierce received the extra $100 as a form of commission for contracting the jobs.

3

the expenses generated by all the jobs being worked on, while Plaintiff characterizes the withdrawals as misappropriations of partnership funds.

Prior to entering into the agreement to work with Mr. Stevens, Mr. Pierce, through his operations as JP Construction, owed a debt to the Internal Revenue Service ("IRS") of approximately $200,000 in withholding taxes, which was the subject of a levy that remains unsatisfied. Due to the IRS levy, Mr. Pierce and Mr. Stevens agreed that everything would be run through Stevens Masonry, including the maintenance of general liability insurance and worker's compensation insurance for all jobs on which worker's compensation insurance was required.[3] It was because of the outstanding IRS levy that proceeds were paid into Stevens Masonry, rather than being paid directly to Mr. Pierce. Mr. Pierce admitted several times during the course of the trial that he did not want the IRS to levy on his account and that he wanted to be paid in cash so as not to have a paper trial. Therefore, if Mr. Pierce was paid on a particular project by check, rather than by cash, he would cash the check at the issuing bank instead of depositing it into his own bank account. At times, Mr. Pierce also received cash to pay the other laborers.

Mr. Pierce has no written records demonstrating any of the funds he received as a result of his business relationship with Mr. Stevens. He has no personal records relating to any of the projects on which he and Mr. Stevens worked together, nor does he have any records as to how much cash he received for himself or to pay the other workers.[4] During the time at issue, Ms. Stevens was tasked with keeping the records and managing the books for Stevens Masonry. At trial, she testified that she had only a high school

---

[3] Besides Mr. Pierce and Mr. Stevens, there was a small handful of laborers who also worked on the projects at issue, all of whom previously worked for Mr. Pierce and JP Construction.
[4] When asked on direct examination how much cash he received from his business relationship with Mr. Stevens, Mr. Pierce responded: "Probably 15 - - without - -I - -I'm not a hundred percent sure because I didn't have any documentation to support it." (Transcript p. 91 lines 15-16).

4

degree and admitted that she lacked the business acumen to keep proper records for a masonry business. Mr. Pierce testified that in 2004, while working with Mr. Stevens, Ms. Stevens would provide written breakdowns of all the jobs worked on, but stopped doing so after they started working together in 2005.[5] However, Mr. Pierce did not corroborate his oral testimony with any illustrative documents to show that Ms. Stevens ever provided him with any such detailed information.

The only records that Mr. Pierce did produce are documents relating to Stevens Masonry and its accounts. These documents include a list of most, but not all,[6] of the major projects worked on throughout 2005 and the beginning of 2006, which was prepared by the Stevenses at the request of Plaintiff's attorney (Plaintiff's Exhibit 11). This list conveys the contracted amount per job, the payroll, other expenses, and what was paid to both Stevens Masonry and Mr. Pierce. However, this document was created largely from memory and is missing some key information, such as the cost of materials for several jobs.[7] The contract prices are also inaccurate because there was testimony that some amounts were not entirely received because Mr. Pierce did not complete his portion of the work on some of the jobs. Plaintiff's Exhibit 38 attempts to correct these amounts. That document is an exact replica of Plaintiff's Exhibit 11, except the contract prices have been crossed out and hand-written higher numbers have been substituted in their place. According to Mr. Pierce, these were the true contract prices for these jobs.

---

[5] In 2004, Mr. Stevens and Mr. Pierce worked with a third mason, Joseph Cirillo, under a similar arrangement where the three split the profits on masonry jobs after taking out expenses and paying the payroll. However, Mr. Cirillo stopped working with both Mr. Pierce and Mr. Stevens by the end of 2004.

[6] The Advanced Auto job on West Genesee Street in Fairmount, New York and the Advanced Auto job in Rome, New York do not appear in Plaintiff's exhibit 11. Yet, Plaintiff disputes receiving the proper amount on both those jobs. Additionally, Plaintiff's Exhibit 11 does not list the job done for Peter Webber in 2005, which was not run through Stevens Masonry. Mr. Pierce testified that both he and Mr. Stevens each pocketed $1,000 from that job.

[7] According to Mr. Stevens, several of the other jobs listed in Plaintiff's Exhibit 11 required the purchase of materials, not just the LaFayette-Muldooney job as depicted.

However, Mr. Pierce did not present any of the underlying contracts in support of his assertions. He also admits to not completing his portion of the work on a few of the jobs and that this factor may have caused Stevens Masonry to receive less than the original contract price. Given the lack of best evidence, the court has difficulty accepting Plaintiff's testimony for the position advanced. Plaintiff also presented a profit and loss statement for Stevens Masonry for 2005 that was prepared by the Stevens' accountant, Alan Bennett (Plaintiff's Exhibit 4). This statement is based upon records presented to Mr. Bennett by Ms. Stevens for the purpose of preparing the Stevens' tax returns. However, testimony at trial indicates that the records presented to Mr. Bennett were not entirely complete and it was up to Mr. Bennett to deduce what was a business expense and what was a personal expense. Finally, Plaintiff's counsel also presented bank records for both Stevens Masonry's checking and savings accounts (Plaintiff's Exhibit 18-A), which list every withdrawal and deposit during 2005.

In early 2006, Mr. Pierce received a 1099 issued to JP Construction from Mr. Bennett for $82,368, which included income received for work performed by Mr. Pierce's employees in 2005. Subsequently, Mr. Pierce listed the very same amount on Schedule C of his own 2005 tax return. At trial, Plaintiff introduced the testimony of Martin Molinari, a retired IRS tax auditor. Mr. Molinari conducted an independent review of the bank records for Stevens Masonry, including the checks made out to Joe Pierce and marked "payroll." According to Mr. Molinari's testimony, there were $45,436 in checks made out to cash marked payroll and $31,328 in checks made out to Joe Pierce. However, none of the underlying checks were produced to identify how these checks were endorsed and who received these funds. Mr. Pierce additionally admitted to

receiving approximately $15,000 in cash. Nevertheless, Mr. Pierce still disputes receiving his fair share of the profits from Stevens Masonry based upon his pure recollection and simple "mathematics."

Mr. Molinari also testified to the substance of his report (Plaintiff's Exhibit 1) which purports to analyze the Stevens' expenses and withdrawals from the two accounts. Specifically, Mr. Molinari classified the expenses and withdrawals as either a personal or business expense in an attempt to prove that the Stevenses misappropriated partnership funds owed to Mr. Pierce. Mr. Molinari conducted his report by cross referencing the bank statements for the two Stevens Masonry bank accounts with the Stevens Masonry profit and loss statement for 2005, Defendants' 2005 tax return, canceled checks from the Stevens Masonry checking account, cash withdrawals from the Stevens Masonry savings account, and debit card usage from the Stevens Masonry checking account. Mr. Molinari did not consult any documents relating to Mr. Pierce's finances while drafting his report. During his testimony, Mr. Molinari admitted to making several sweeping generalizations, which ultimately mischaracterize many of the findings made in his report. For example, Mr. Molinari admitted to classifying an expense as a personal expense rather than a business expense if a check was made out to cash or if he did not understand or recognize what an expense was for. He also marked items as personal expenses if they appeared too small to be a business expense. Additionally, Mr. Pierce testified that he received money from the Debtors to pay for his own personal expenses in excess of $1,300 on two separate occasions—once for dental work and another to have his vehicle fixed. However, in his report Mr. Molinari classified these expenses as personal expenses of the

Debtors. Moreover, and most damaging, Mr. Molinari admitted that the records were entirely inadequate and that it was difficult to determine how funds were disbursed.

> I didn't even know if the checks that were mark - - marked to cash marked "payroll" were in fact for payroll because the records for payroll were so inadequate you couldn't tie in any number, you couldn't tie in any total. It was extremely difficult to try and make sense of the records that were presented in any reasonable fashion to come up with an accurate statement.

Transcript p. 233 lines 4–10. Therefore, the court has serious doubts concerning the import of Mr. Molinari's testimony and the weight to be accorded to his report.

### *Burden of Proof*

According to the United States Supreme Court, the burden of proof on a § 523(a)(4) claim lies with the party claiming non-dischargeability, which must be proved by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 285–86 (1991). Additionally, the Second Circuit has "repeatedly stressed that the 523(a) exceptions to discharge must be strictly construed in favor of the debtor in order to comport with the 'fresh start' policy underlying the Bankruptcy Code." *Zohlman v. Zoldan*, 226 B.R. 767, 771 (S.D.N.Y. 1998) (internal citations omitted).

### *Partnership and Fiduciary Capacity*

Under § 523(a)(4), "a discharge under section 727...does not discharge an individual debtor from any debt—for fraud or defalcation while acting in a fiduciary capacity...." 11 U.S.C. § 523(a)(4). Therefore, in order "to sustain a cause of action for fraud or defalcation under § 523(a)(4), the plaintiff must first establish that the debtor acted while in a fiduciary capacity." *Zohlman*, 226 B.R. at 772 (citing *Barristers Abstract Corp. v. Caulfield*, 192 B.R. 808, 818 (Bankr. E.D.N.Y. 1996)).

The United States Supreme Court has held that the meaning of fiduciary is to be interpreted under federal law. *See Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934). Additionally, the term is to be narrowly construed in the context of § 523(a)(4) and does not include the general, broad definition that encompasses confidence, trust, and good faith. *Zohlman*, 226 B.R. at 772. Rather, the term applies "only to express or technical trusts," which must arise prior to and exist independently of the creation of the debt. *Id.* at 772–73; *In re Dobrayel*, 287 B.R. 3, 14 (Bankr. S.D.N.Y. 2002) ("Such technical or express trusts must exist prior to and independently of the wrongful conduct giving rise to the claim of non-dischargeable debt."). The trust "cannot be said to arise merely from the wrongful conduct itself." *Zohlman*, 226 B.R. at 772–73. However, while federal law prescribes that a fiduciary relationship must derive from an express or technical trust, "state law tells us when an express or technical trust exists." *Id.* at 773. Therefore, the court must consider New York Partnership Law in order to determine whether Mr. Pierce and Mr. Stevens were in fact partners owing each other a fiduciary duty.

Pursuant to New York Partnership Law § 43, partners owe each other a fiduciary duty to account to each other for partnership funds: "[e]very partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners...." N.Y. P'ship Law § 43 (McKinney). In the Second Circuit however, courts have not adopted this language as enough to create a pre-existing trust relationship, but rather only an *ex maleficio* trust because fiduciary obligations remain dormant until after the creation of the debt. *Zohlman*, 226 B.R. at 774 (citing *In re Stone*, 94 B.R. 298 (S.D.N.Y. 1988) *aff'd*, 880 F.2d 1318 (2d Cir. 1989); *In re Sawyer*,

130 B.R. 384 (Bankr. E.D.N.Y. 1991)). However, this Circuit has held that the fiduciary requirement of §523(a)(4) can still be met if state common law has elevated the duties of partners beyond the statute so as to create an express or technical trust. *Zohlman*, 226 B.R. at 774 (citing *Ragsdale v. Haller*, 780 F.2d 794, 796–97 (9th Cir. 1986)). This is the case in New York since the courts have held that "New York partners are *at all times* accountable to one another as trustees." *In re Stone*, 94 B.R. at 303. Therefore, in order to support a claim under § 523(a)(4), it must be established that Mr. Pierce and Mr. Stevens were partners as a matter of law.

New York Partnership Law defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." N.Y. P'ship Law § 10. However, while the sharing of profits alone is *prima facie* evidence of a partnership, such is not dispositive. *Fasolo v. Scarafile*, 120 A.D.3d 929, 931, 991 N.Y.S.2d 820, 823 (App. Div. 2014). Rather, the parties' entire business relationship must be analyzed under a totality of the circumstances. *Id.* Thus, when determining whether a partnership exists giving rise to a fiduciary duty, courts look to a number of factors including "the intent of the parties, whether there was a sharing of profits *and* losses, and whether there was joint control and management of the business." *Id.* (emphasis added). Furthermore, an individual with "no proprietary interest in a business except to share profits as compensation for services is not a partner." *Scott v. Rosenthal*, 2000 WL 1863542, *3 (S.D.N.Y. Dec. 20, 2000) (citing *Impastato v. De Girolamo, M.D.*, 459 N.Y.S.2d 512, 514 (N.Y. Sup. Ct. 1983), *aff'd*, 464 N.Y.S.2d 382 (App. Div. 1983)).

Mr. Pierce falls extremely short of his burden to establish the existence of a partnership. First, and most importantly, Mr. Pierce is not a "co-owner" of the business as

mandated by New York Partnership Law. In fact, Mr. Stevens is not even a co-owner. Ms. Stevens is the sole owner of Stevens Masonry and is the only one who has control over the funds that flow to and from the Stevens Masonry accounts. Mr. Pierce testified at trial that he never had any conversations or agreement to be partners with Ms. Stevens, his agreement was solely with respect to Mr. Stevens. Additionally, he never had any control over or access to either the Stevens Masonry checking account or savings account—Mr. Pierce did not even know about the savings account until after bringing suit. Consequently, Mr. Pierce had no ownership interest in any partnership, nor any control over any partnership funds. He could not withdraw funds to pay for equipment rentals, make insurance payments, pay the other workers, or even pay himself. Therefore, the only interest that Mr. Pierce can be said to have had is an interest to share in the profits of certain jobs that he collaborated on with Mr. Stevens—nothing more.

Second, it cannot be determined, at least beyond a preponderance of the evidence, that both parties intended to form a partnership. According to the testimony, the savings account was opened in anticipation of an eventual partnership, but not for one that was already in existence. While Mr. Pierce claims that he and Mr. Stevens were "partnered up," Mr. Stevens views his relationship with Mr. Pierce in 2005 as a trial period to see if the two could form something more formal in the future. Additionally, Ms. Stevens, who was handling all of the funds, never had any conversations with Mr. Pierce about the business, how it was to be run, or how funds were to be disbursed. Ms. Stevens only discussed the business with her husband. Plaintiff's counsel tried to prove Mr. Stevens' intention to form a partnership through the testimony of Terry Wirth—the sole purpose of which was to show that Mr. Pierce and Mr. Stevens referred to each other as partners

while out socially. However, this does little in the eyes of the court and, if accepted as true, fails to demonstrate either the true intentions of Mr. Stevens or the legal import of his arrangement with Mr. Pierce. The fact that individuals refer to each other as partners in the colloquial sense, does not make them partners under the law. While such may be considered evidence of a party's intent, it is not enough given the context of this case—specifically that there was an oral agreement to split profits between two individuals, both of whom had no access over Ms. Stevens' business bank accounts.

Also shedding light on the parties' intent is the fact that neither Mr. Stevens nor Mr. Pierce filed a partnership tax return and both reported income from the business on Schedule C of their 2005 individual tax returns. Mr. Molinari testified on direct that "partners do not give each other 1099's, they prepare a partnership return and split the profits" and then they each get a Schedule K-1. Meanwhile, Stevens' accountant issued a 1099 to JP Construction. There is no evidence of a Schedule K-1 and Mr. Pierce accepted the amount in the 1099 as being accurate (at least for tax purposes) when he listed the exact same amount in Schedule C of his very own tax return.

Finally, Mr. Pierce had no agreement with Mr. Stevens concerning how losses were to be shared. "The requirement that parties have agreed to share in the profits *and* losses is 'an indispensable essential of a contract of partnership or joint venture.' " *Usov v. Lazar*, 2014 WL 4354691, at *10 (S.D.N.Y. Sept. 2, 2014) (quoting *Steinbeck v. Gerosa*, 4 N.Y.2d 302, 317 (1958)) (emphasis added). Without an agreement pertaining to the sharing of losses, "the first essential element of a partnership is missing as a matter of law." *Usov*, 2014 WL at *11 (citing *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 175 (S.D.N.Y. 2004)). When an audit by the State Insurance Fund ensued

12

over Stevens Masonry, there was no agreement as to how any losses would be split. Mr. Pierce admitted that it was just assumed that Stevens Masonry would pay for any amount owed. In fact, there was never any agreement between the two as to how losses would be split in any capacity, including whether they lost money on a particular job or whether a lawsuit ensued, let alone whether an audit took place. Plaintiff's counsel argues that the agreement to split expenses and pay the payroll for a given job constitutes an agreement to share in the losses. However, the court is of the opinion that such equates to a sharing of the costs, not losses.

Further, it is more than likely that Mr. Pierce would not have been able to share in the losses at all, even if a conversation did take place, due to his outstanding debt owed to the IRS. While the court recognizes the fact that a party need only have an agreement on how losses are to be shared, rather than to actually contribute to them, it is important to note that the IRS debt is what primarily prevented Mr. Pierce from being a partner in the first place. It is because of the IRS levy that Mr. Pierce could not deposit funds into his own bank account, afford to pay for the liability or worker's compensation insurance, or have any interest in or control over any joint bank account. Ultimately, Mr. Pierce's past trouble with the IRS was the driving factor that forced everything to be run through Ms. Stevens' business, Stevens Masonry, thus precluding Mr. Pierce from having any control over the business he claims to have "partnered up" with. On this basis alone, Plaintiff's complaint must be dismissed.

*Fraud or Defalcation*

If a reviewing court were to disagree and find that the parties were partners obligated to each other in a fiduciary capacity, Plaintiff fails to meet the heightened

standard of establishing the presence of fraud or defalcation as required by § 523(a)(4). The Supreme Court has held that the type of fraud necessary to sustain a claim under § 523(a)(4) requires intentional fraud, involving deliberate wrongdoing or moral turpitude. *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1759 (2013) (citing *Neal v. Clark*, 95 U.S. 704, 709 (1878)). Similarly, the Supreme Court has held that defalcation under § 523(a)(4) requires a showing of intentional wrongdoing or extreme recklessness—*i.e.* a conscious disregard to a substantial and unjustifiable risk. *Bullock*, 133 S. Ct. at 1759. Therefore, "plaintiff must demonstrate that the defendant had actual knowledge of the fiduciary duty that was breached." *In re Shao Ke*, 2012 WL 1890261, at *8 (Bankr. N.D.N.Y. May 23, 2012) (quoting *E. Armata, Inc. v. Parra (In re Parra)*, 412 B.R. 99, 106 (Bankr. E.D.N.Y. 2009)). As articulated by the Second Circuit, "[b]y requiring the courts to make appropriate findings of conscious misbehavior or recklessness in the course of dischargeability litigation, the standard...insures that the harsh sanction of non-dischargeablility is reserved for those who exhibit some portion of misconduct." *In re Hyman*, 502 F.3d 61, 69 (2d Cir. 2007) (internal citations omitted). Thus, the standard does not include those fiduciaries who may have only acted negligently. *Id.*

Mr. Pierce presents no evidence that the Debtors acted willfully or recklessly in failing to account for profits during the course of their relationship in 2005. Mr. Pierce has no personal records relating to the jobs at issue and his claims for fraud or defalcation rest on the bank records and the report of Mr. Molinari. However, the conclusions that Mr. Molinari draws in his report are entirely undermined by the very flaws which he admits to making on essentially every page. Mr. Molinari assumed that the parties were

14

partners and did not have the benefit of reviewing the Stevens' deposition testimony prior to making his analysis. Mr. Molinari assumed that if a check was made out to cash it was automatically a personal expense. He also admitted that if he did not understand the nature of an expense, or if an expense appeared too insignificant, it was also designated as personal. Additionally, personal expenses in excess of $1,300 paid on behalf of Mr. Pierce were classified as personal expenses for the Stevenses. The court finds it extremely difficult to infer the requisite state of mind of either Debtor, especially one requiring conscious wrongdoing, based solely on such a faulty report.

Similarly weighing against any inference of conscious wrongdoing, is the fact that Ms. Stevens had limited schooling with no comparable experience maintaining such records before assuming her role d/b/a Stevens Masonry. The Stevenses did not personally prepare the 2005 profit and loss statement for Stevens Masonry nor the 1099 issued to JP Construction—these documents were prepared by the Stevens' accountant. While Plaintiff argues that Ms. Stevens intentionally withheld or destroyed documents, the court does not make that finding on the present evidence. Ms. Stevens went to her accountant, on behalf of herself and her husband, so that he could prepare their annual tax returns. She did not go with the intent of providing deficient business records so that her accountant would prepare a 1099 for Mr. Pierce that would eventually support her position in a future lawsuit.

Ultimately, from the record before the court, it is impossible to deduce what the plaintiff suggests—that Defendants were intentionally spending partnership funds owed to Mr. Pierce for their personal use from the Stevens Masonry accounts. Plaintiff presents no records of what he actually received or what he was supposed to receive. Plaintiff's

entire case rests solely on his recollection of events from almost a decade ago. When asked how much cash he received, he even admitted "I'm not a hundred percent sure because I didn't have any documentation to support it." Further, not all jobs were run through Stevens Masonry as evidenced by the work done for Peter Weber where the parties received cash.

*Conclusion*

Without actual contract prices, proof of what was actually received and what was actually disbursed, Mr. Pierce presents nothing more than a "jumbled business mess." The court rejects Mr. Pierce's claim that he was a partner with Mr. Stevens, and concludes that he was not a partner under New York law and thus no fiduciary duty arose as required by § 523(a)(4). Furthermore, from the evidence adduced, the court finds no basis from which to infer that either Debtor possessed the requisite state of mind to commit fraud or defalcation. Accordingly, a separate judgment shall issue dismissing Plaintiff's complaint.

So Ordered.

Dated: November 25, 2014
Syracuse, New York

Margaret Cangilos-Ruiz
United States Bankruptcy Judge